Avelino González Mena, Plaintiff and Appellant, *v.* Dannermiller Coffee Co., Defendant and Appellee.

No. 6685.. Argued May 21, 1935.—Decided June 7, 1935.

C. del Toro Fernández for appellant.  José López Baralt for appellee.

Mr. Justice Córdova Dávila delivered the opinion of the court.

Avelino González Mena brought an action, entitled for rescission of contract and for damages, against the corporation Dannermiller Coffee Co., in a complaint which, as he claims, contains three causes of action: One for rescission of contract, another for damages sustained by the plaintiff by reason of the profits he had failed to realize, namely, the difference between the purchase price and the resale price, and another for damages suffered because the defendant, by its voluntary acts, injured and defamed the name of the plaintiff in his commercial dealings, causing him the loss of customers and mental anguish which has. affected his health.

The District Court of San Juan, upon demurrers interposed by the defendant, dismissed the complaint, with costs to the defendant. It is alleged in the complaint that prior to February 29, 1932, the plaintiff Avelino González Mena was a merchant engaged in the purchase and resale of coffee in Puerto Rico, residing in Santurce; that the defendant was

a private corporation which speculated in imports and exports of the same article, having its principal office in New York, United States of America, and doing business in this island through its agents; that on February 29, 1932, the Dannermiller Coffee Co. entered into a contract covering a current account with the plaintiff, to whom it granted a credit amounting to $1,000 on condition that each order which should thereafter be placed on contracts for the purchase of coffee should be covered by a draft payable at 25 days sight, and that in case three different orders should be outstanding at the same time, the plaintiff should pay the first draft, then accept the third, and then when due, the second would become the first, and so on, successively; that in the event the merchandise, once in Puerto Rico, should not be taken up by the buyer within 15 days, the seller Dannermiller Coffee Co. could dispose of it after that time; that on March 24, 1932, the plaintiff made a contract with the defendant through José Quintero Castro, its agent at that time, for the purchase, under the said credit, of 300 bags of roasted coffee, weighing 100 lb. each, at 11 cents per pound, and on April 11, 1932, he extended that contract with the defendant through the Nitrate Agencies Co., which had then charge of its agency in Puerto Rico, covering 200 additional bags of the same coffee, at the same price, under the same conditions, and the shipment to be subject in both cases to the orders which the plaintiff, at his convenience, might send to the defendant from time to time; that on July 11, 1932, the plaintiff ordered the defendant to ship a balance of 51 bags of coffee, which were shipped and consigned to the plaintiff at his residence in Santurce, San Juan, according to the bill of lading, invoice, and draft covering the value of the merchandise, which documents were held by The National City Bank of New York, San Juan Branch; that the said coffee was shipped on August 24 on the S. S. "Borinquen" which arrived at San Juan five days later; that upon his being notified of the shipment of the 51 bags by the defendant, the

plaintiff appeared at the offices of The National City Bank of New York, San Juan Branch, on September 3, 1932, with the intention and purpose, which he stated there, of paying forthwith the draft due against him and accepting the other draft which was pending, and demanded delivery of the corresponding papers in order to take up and carry away the said merchandise; that he could not carry out this purpose because The National City Bank of New York, San Juan Branch, informed him that, on the day before, the Nitrate Agencies Co. had requested all of the papers concerning the shipment of the 51 bags of coffee in order to sell them to Jiménez & Fernández, local merchants, at 12¼ cents per pound, according to instructions received by the said agency from the Dannermiller Coffee Co., and confirmed by telegraph, and as a result the bank delivered to the Nitrate Agencies Co. all the documents mentioned above; that on September 3, 1932, the Nitrate Agencies Co., acting under instructions from, and on behalf of, the Dannermiller Coffee Co., sold the 51 bags of coffee belonging to the plaintiff, to the firm of Jiménez & Fernández at a price of 12 cents per pound, thereby preventing the plaintiff from discharging pressing obligations which he had contracted with his clients in Puerto Rico; that on said date the plaintiff was within the term during which he could take up his coffee at the dock in San Juan, and there was no outstanding draft against which he was bound to pay except the one concerning the shipment of coffee of which he was deprived by the Dannermiller Coffee Co.; that when these facts occurred, there was a shortage of coffee in San Juan, and the plaintiff had already contracted to sell to his clients at a price of $30 per hundredweight, the 51 bags which he had bought at $11 per hundredweight from the defendant, and thus he failed to realize a profit amounting to $204, after deducting the customs duties, and that in consequence of the conduct of the Dannermiller Coffee Co., the clients of the plaintiff lost confidence in him and took away their business, thereby

causing him to lose a profit of not less than $2,000 which he would have made from said clients in a year; that at the time of the breach of the contract, plaintiff's trade name enjoyed a good reputation, and that the acts of the Dannermiller Coffee Co. in instructing the Nitrate Agencies Co. to withdraw all of the documents from The National City Bank, and in preventing the plaintiff from taking up the coffee consigned to him, by means of telegraphic instructions to The National City Bank, and the sale of the coffee made to another commercial firm, have injured and defamed the good name of the plaintiff in the community; that the conduct of the defendant was known to the Nitrate Agencies Co. and its employees, to The National City Bank and its employees, to the commercial firm of Jiménez & Fernández and its employees, and to many other persons connected with them, and that it later became public and was interpreted in the sense that the Dannermiller Coffee Co. had withdrawn credit to, and lost confidence in, the plaintiff, which caused him shame and intense mental anguish that seriously affected his health beginning with nervous disorders and leading to a liver ailment which has required medical treatment.

The first error assigned is that the court erred in sustaining the demurrer for insufficiency directed against the third cause of action. The allegations set forth in the complaint do not constitute three causes of action. The plaintiff bases his claim on the breach of a contract and divides the damages which he alleges were caused him into different items, on the assumption that the loss of anticipated profits and the damages to which he believes himself entitled because of mental anguish give rise to two distinct causes of action. Really the action exercised is one for damages for breach of contract. However, since the plaintiff assumes in his assignment of errors that these items constitute separate causes of action, we shall so consider them for the purpose of this decision.

The third cause of action to which the appellant refers in his first assignment of error, is the one whereby it is sought to recover damages caused by the strange conduct of the defendant, which has had an injurious and defamatory reflection on the good name of the plaintiff in the community, causing him shame and intense mental anguish which has seriously affected his health, beginning with nervous disorders and leading to a liver ailment which has required medical attention.

The appellee argues that the plaintiff cannot recover damages of a remote character which are not the natural and logical consequence of the alleged breach of contract on the part of the defendant. That was the ground on which the lower court decided the demurrers and dismissed the complaint.

The appellee cites a number of decisions by the American courts to support its theory that the damages alleged are remote and not foreseen by the parties. The general rule is that in an action for damages for breach of contract, the defendant is liable only for the direct consequences of the breach, and which were or might have been foreseen by the contracting parties when the contract was entered into as likely to result from its nonperformance. *City of East Grand Forks* v. *Steele*, 45 L.R.A.(N.S.) 205, 121 Minn. 296, 141 N.W. 181.

In the case of *M. M. Stone & Co.* v. *Postal Telegraph Co.*, 35 R.I. 498, 87 Atl. 319, the court expressed itself thus:

"The rule as to special damages for breach of contract, followed by the courts of England and the United States and approved by this court in *Greene* v. *Creighton*, 7 R.I. 1, was laid down by Baron Alderson in *Hadley* v. *Baxendale*, 9 Exch. 353, in the following terms: 'Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive, in respect of such breach of contract, should be such as may fairly and reasonably be considered either naturally arising—i. e., according to the usual course of things—from such breach of contract itself, or such as may reasonably be supposed to have been in the contempla-

tion of the parties, at the time they made the contract, as the probable result of it. Now, if the special circumstances under which the contract was actually made were communicated by the plaintiffs to the defendants, and thus known to both parties, the damages resulting from the breach of such contract, which they would reasonably contemplate, would be the amount of injury which would ordinarily follow from a breach of contract under those special circumstances so known and communicated. But, on the other hand, if these special circumstances were wholly unknown to the party breaking the contract, he, at most, could only be supposed to have had in his contemplation the amount of injury which would arise generally, and in the great multitude of cases not affected by any special circumstances, from such breach of contract.' "

Sections 1058, 1059, and 1060 of the Civil Code, which deal with damages resulting from breach of contract, provide:

"Section 1058.—No one shall be liable for events which could not be foreseen, or which having been foreseen were inevitable, with the exception of the cases expressly mentioned in the law or those in which the obligation so declares.

"Section 1059.—Indemnity for losses and damages includes not only the amount of the loss which may have been suffered, but also that of the profit which the creditor may have failed to realize, except as otherwise provided in the following sections.

"Section 1060.—The losses and damages for which a debtor in good faith is liable, are those foreseen or which may have been foreseen, at the time of constituting the obligation and which may be a necessary consequence of its nonfulfillment.

"In case of fraud, the debtor shall be liable for all damages which may clearly arise from the nonfulfillment of the obligation."

Section 1059, according to which the payment of damages shall include not only the amount of the loss which may have been suffered, but also that of the profit which the creditor may have failed to realize, is made subject to section 1060, which limits the damages for which a debtor in good faith is liable to those foreseen or which might have been foreseen, at the time of constituting the obligation, and which are a necessary consequence of the failure to comply with it. The last paragraph of section 1060 establishes an important dis-

tinction because, according to the same, the fraudulent debtor (*deudor doloso*) is liable not only for all damages foreseen or which may have been foreseen at the time of constituting the obligation, but also for those which clearly originate from its nonperformance.

These sections, applicable to all kinds of obligations, have merited the careful and sound consideration of the commentators on the civil law. Manresa, in commenting on sections 1106 and 1107 of the Spanish Civil Code, equivalent to sections 1059 and 1060 of our Code (1930 ed.), says:

"The evident generality of these sections, which are applicable to all kinds of obligations, in relation to the special provisions of each section, as has been recognized, for example, in regard to leases (Judgment of the Supreme Court of February 12, 1896), and their breadness of expression, albeit there are certain limitations in section 1107, are causing and will cause them to be continually invoked; but this does not prevent their being strictly construed by the courts, whose attitude, as we have already indicated in commenting on another section—section 1101—which is also broad and germane to these, is none the less well founded.

"Section 1107 reflects, in the varying scope which according to the cases it fixes for the indemnity, the differences in gravity existing between the causes of the damages, which are set forth in the preceding sections; differences which it was natural to take into account, due to the nature of the indemnity, which, if not a *penalty,* is a *compensatory sanction.*

"According to these causes and this section, there are two possible hypotheses: the case of the obligor in good faith and the case of the fraudulent obligor. In the first hypothesis two circumstances —not merely one of them but both jointly—must concur in the damages, to wit: that such damages might have been foreseen at the time of constituting the obligation (not after it had been constituted), and that they are a necessary consequence of the nonfulfillment of the obligation, and not merely contingently, nor even incidentally, connected with such nonfulfillment.

"There is no doubt that the burden of showing that the said circumstances concur in the damages is on the party who believes himself injured, and the evidence to establish them should be as sufficient as is required to prove the existence of the damages, inasmuch as they are also an essential ground for the damages which he claims.

"Inasmuch as the two paragraphs of section 1107 restrict the scope of the damages, they differ from each other, in harmony with the respective hypotheses, in that the limitation of the first has reference to the scope and the proof of the damages, and the limitation of the second refers only to such proof. Accordingly, in so far as the *cause* of the damages is concerned in a case of fraud, it is not essential that the damages be a *necessary consequence* of the nonperformance, it is sufficient that they *arise* therefrom; a very different term or concept which has a wider scope, and an assertion, which is corroborated by the use of the word *all* placed before damages. On the other hand, with respect to the evidence, the use of the adverb *clearly* presupposes the requirement that the same be sufficient, since the legislator excludes any doubtful connection between the damage and the cause attributed to it. Nor can it be doubted, in regard to the evidence, that it is the claimant who must show that his case falls within the second hypothesis of this section, and not the first, since good faith is presumed while fraud is not.

"On the other hand, the Supreme Court, interpreting somewhat strictly the doctrine of the Code, has held that from the express terms of sections 1106 and 1107 'it is inferred that the indemnities for damages, whether foreseen or which might have been foreseen, include those which are a necessary consequence of the nonfulfillment of the obligation incurred by the debtor; and that the law does not require that such a consequence be *direct,* but only that it be necessary.' (Judgment of April 20, 1915)." 8 Manresa 94, 96, and 97.

Scaevola, quoting from Toullier, notes that there is fraud whenever an obligation is not fulfilled, or is belatedly fulfilled, "with the desire to injure the other party," and he adds that only the latter element of this definition is useful, because the mere fact that an obligation is not fulfilled, or that it is fulfilled after the time agreed, falls more properly within the concepts of default and negligence, respectively, than within that of true fraud.

According to section 1055 of the Civil Code (1930 ed.), liability arising from fraud is demandable in all obligations. Commenting on this section, which corresponds to section 1102 of the Spanish Code, Scaevola says:

"Fraud is really a concept of the criminal law, which has been transferred, in certain aspects, to the civil law, but which belongs

essentially within the sphere of crime, and like crime, it becomes such by what the criminologists call *malice,* that is, the intention of harming another person or his property. Herein fraud differs fundamentally from negligence and default, which with it share the domain of irregular fulfillment of obligations.

"Negligence and default cause damage, not without a certain intervention of the will, which we will discuss later and which is something like an indirect intention to do harm. But in fraud, as in crime, this intention is direct, and thus fraud is philosophically confused with crime, because, essentially nothing separates them. Because of this, many eminent jurists have attempted from time to time, as a check against bad faith, to carry expressly into the Penal Code the actions for fraud which, perhaps without justification, are now to be found exclusively within the civil legislation.

"Fraud is, in brief, the desire to injure another, and whenever this desire crystallizes into real damage, it fits the provision of the section which we are discussing." 19 Scaevola, *Comentarios al Código Civil,* 495.

In the instant case, the element of fraud, which does not appear in the allegations of the complaint, must be discarded. It is not alleged that the conduct of the defendant is fraudulent; and as good faith is presumed, if no allegation exists to the contrary, it cannot be assumed that any fact has been established to overcome this presumption. In the absence of fraud, the damages which the plaintiff may recover are those foreseen, or which might have been foreseen, at the time of constituting the obligation, and which are the natural consequence of the failure to comply with it. The complaint fails to allege any damages that were foreseen, and therefore we must rely upon those which might have been foreseen when the contract was made. Any damages for mental suffering sustained by the plaintiff are certainly not recoverable in this action, which is based on a breach of contract. They may not be recovered either in our civil law or in the American law, except in rare cases wherein the breach of contract is of such a character as to support an action of tort. *Young* v. *Western Union Telegraph Co.,* 107 N.C. 370;

*Beaulieu* v. *Great Northern Ry. Co.*, 19 L.R.A. (N.S.) 564, 103 Minn. 47. The error assigned must be overruled.

In the so-called second cause of action certain damages are claimed which were also considered remote by the lower court. The plaintiff alleges that at the time of the breach of contract complained of, he had already sold to his clients, at $30 per hundredweight, the 51 bags of coffee which he bought at $11 per hundredweight, and thus failed to realize a profit of $204, after deducting the customs duties. There is no doubt that the facts thus alleged stated a cause of action, and the lower court so declares, although it held itself without jurisdiction to entertain the same. The plaintiff claims, clearly and definitely, the difference between the sale price stipulated in the contract and the price agreed with his clients, to which he has a perfect right; but then he goes further and alleges that, by reason of the conduct of the defendant, the clients of the plaintiff lost confidence in him and ceased doing business with him, causing him to lose $2,000 in profits which he would have made from said clients in a year. On these vague and indefinite generalities, the plaintiff claims profits which he considers he might have realized, without even mentioning the existence of any agreement to sell coffee to his clients during the time stated. We do not know the plaintiff's ground for claiming the profit which he might have realized in a year. Similarly as he has fixed this period of time, so he could have extended it or shortened it to suit his fancy, and could even have made his claim for an indefinite period. We do not believe that these damages can be included in the category of those which might have been foreseen at the time of constituting the obligation, and which are a necessary consequence of the breach of contract.

The second error assigned is that the court erred in holding that the first and second causes of action alleged in the complaint set out but a single cause of action. The third and fourth errors assigned are that the court erred in hold-

ing that it had no jurisdiction to entertain the complaint, on the ground that the actions brought constituted a single action involving the sum of $204. As we have already said, the action brought is for damages for breach of contract. In the first cause of action the plaintiff sets out the basis for his claim. In the second he fixes the amount of damages for loss of profits for a year, when his clients lost confidence in him. The lower court held that the so-called first and second causes of action were but one, and that, after eliminating the item of $2,000, to which we have already referred, the claim became reduced to $204, which is below the jurisdictional amount. The conclusion of the court *a quo* seems correct to us. Once the other damages alleged in the complaint are discarded, the claim of the plaintiff is reduced in amount to a sum over which the district court has no jurisdiction, and for this reason we are of the opinion that the demurrers filed by the defendant were properly decided. In *Núñez* v. *Ruga,* 35 P.R.R. 198, this court held that when two causes of action are set up in a complaint filed in the district court, and one of them does not lie, the court lacks jurisdiction to render judgment on the other if the amount involved in it does not exceed $500.

The judgment appealed from must be affirmed.